**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MICHAEL E. TEUTON,
Plaintiff-Appellee,

v.

No. 98-2807

THE PAUL REVERE LIFE INSURANCE
COMPANY,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Patrick Michael Duffy, District Judge.
(CA-97-753-3-23)

Argued: March 3, 2000

Decided: April 18, 2000

Before LUTTIG and TRAXLER, Circuit Judges,
and Jackson L. KISER, Senior United States District Judge
for the Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Bowman McLeod, HAYNSWORTH, MARION,
MCKAY & GUERARD, L.L.P., Greenville, South Carolina, for
Appellant. David Maurice Ratchford, RATCHFORD & HAMILTON,
L.L.P., Columbia, South Carolina, for Appellee. **ON BRIEF:** W.
David Conner, HAYNSWORTH, MARION, MCKAY & GUE-

RARD, L.L.P., Greenville, South Carolina, for Appellant. Charles W. Bagnal, RATCHFORD & HAMILTON, L.L.P., Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The district court excluded the admission of certain evidence from trial by granting a pre-trial motion in limine and by sustaining a mid-trial objection. Post-trial, the district court denied a motion for judgment as a matter of law, or, alternatively, for a new trial. Defendant assigns both of these rulings as error. Finding no error in the district court's decisions, we affirm.

I.

In May of 1993 the Appellant, The Paul Revere Life Insurance Company ("Paul Revere"), issued the Appellee, Dr. Michael E. Teuton, a Disability Income Protection Policy. The general purpose of such a policy is to provide benefits should the insured's disability impair his ability to earn income from his occupation. On the policy Teuton listed his occupation as an obstetrics and gynecology specialist ("OB/GYN"). His OB/GYN practice was facilitated by his privileges at Byerly Hospital in South Carolina.

A total disability occurs under the policy when the insured, because of injury or sickness, is "unable to perform the important duties" of an OB/GYN. A residual disability occurs when, because of injury or sickness, the insured is "unable to perform one or more of the important duties" of an OB/GYN or when the insured is "unable to perform the important duties of [an OB/GYN] for more than 80% of the time normally required to perform them." The insured cannot be residually

2

and totally disabled simultaneously.**1** A June 1993 letter from Paul Revere acknowledges that Teuton's protected occupation is that of an OB/GYN specialist and that if Teuton "could be working in some other occupation or specialty [it] would not preclude the payment of total disability benefits."

Due to marital difficulties, Teuton and his third wife, Johnnie, separated in July 1993. On November, 4, 1993, police reports indicate that Teuton physically attacked Johnnie. After Teuton was arrested for burglary in the first degree and assault and battery with intent to kill he was involuntarily admitted to Charter Rivers, a private mental institute in South Carolina. The involuntary admission, also occurring on November 4, 1993, arose from an application signed by Teuton's family physician, Dr. Thomas Bell. A court ordered Teuton's commitment and he was to be evaluated for any danger he might pose to himself or others.

Teuton's primary treatment at Charter Rivers was provided by a psychiatrist on call when Teuton arrived there, Dr. Larry Nelson. Dr. Nelson has seen Teuton over a hundred times. Dr. Nelson discharged Teuton from Charter Rivers on November 29, 1993, saying that Teuton has had moderate depression that "waxes and wanes" and that Teuton was taking antidepressants prescribed by Dr. Bell.**2** These antidepressants cause Teuton's hand to tremor, Dr. Nelson noted.

To ensure Teuton's tranquility, a judge recommitted Teuton to Charter Rivers about two weeks after the initial discharge. After Teuton's final release from Charter Rivers his OB/GYN practice soon closed and he lost his privileges with Byerly Hospital, making it difficult to obtain privileges elsewhere.

_____

**1** The insured must also be under physician's care to receive total or residual benefits, but this requirement may be waived by Paul Revere. An actual loss of earnings while the insured is working, as an OB/GYN or otherwise, is required to receive benefits pursuant to a residual disability.

**2** Dr. Nelson also said that Teuton suffers from anxiety, attention deficit disorder, and other health-related problems.

In December 1993 Teuton filed a claim pursuant to the Paul Revere policy saying that he had "severe depression." Paul Revere's policy payments to Teuton began in March 1994 but the payments stopped in January 1997.

Dr. Nelson testified that Teuton was totally disabled (as defined by the Paul Revere policy) while at Charter Rivers from November 4 to November 29, 1993, but from then to late April-early May 1994 Teuton "could probably return" to his OB/GYN practice if his treatments worked (Teuton's antidepressants were not presently causing a tremor that would limit his surgical abilities). When Teuton's Byerly privileges were not re-instated in April 1994 it was, however, "kind of the start of a very slippery slope" and led to severe depression. Teuton has been, Dr. Nelson testified, totally disabled since late April-early May 1994 because he cannot perform the procedures that are the "important duties" of an OB/GYN specialists, such as surgical procedures. Teuton will remain "totally and permanently" disabled, Dr. Nelson continued, because he must take his antidepressant to combat his depression but that this medication causes a hand tremor that prevents Teuton from performing OB/GYN surgery. Teuton can, Dr. Nelson acknowledged, perform "some" duties of a medical practice, which are also things that an OB/GYN performs (e.g., a pelvic exam). The stress of practicing as an OB/GYN could deepen Teuton's depression, Dr. Nelson adds.[3]

Much of Dr. Nelson's diagnosis was corroborated by two expert witnesses offered by Teuton. Dr. William Dennis, an OB/GYN professor and practitioner, offered expert testimony that Teuton is "to-

_____

[3] Paul Revere attacked Dr. Nelson's credibility with evidence indicating that from January 1994 to April 1994 Dr. Nelson said Teuton could perform as an OB/GYN while, from February through May 1994, he told Paul Revere that Teuton had been totally disabled since November 4, 1993. Dr. Nelson testified that his inconsistent statements were "clearly a mistake" caused by an inadequate review of his records. Dr. Nelson's diagnosis during those disputed periods is relevant only insofar as it might have affected his credibility because Dr. Nelson consistently diagnosed Teuton as totally disabled to perform as an OB/GYN specialist after May 1994 and the issues on this appeal involve Teuton's policy rights after February 1997.

tally disabled" to perform the important duties of an OB/GYN because he cannot make competent decisions in the clinical practice. In September 1996 Teuton saw Dr. Deborah Leverette, an expert in psychiatry, to obtain a second opinion regarding electrotherapy.[4] Dr. Leverette diagnosed Teuton as suffering from a major depression, among other ailments, and said that Teuton is totally disabled to practice medicine whatsoever, including as an OB/GYN.

Teuton's employment varied after his November 1993 arrest. At various times through 1994 to 1996, Teuton worked as an emergency room physician, a physician in urgent care medicine, and in an OB/GYN-related capacity in Nigeria (though not as an OB/GYN specialist). From February to April 1997 Teuton was allegedly pursuing a writing career. During a portion of the following four months, from May to September 1997, Teuton worked at an impotency clinic. Afterwards, from October to December 1997, Teuton maintained a part-time urgent medical care position. Finally, from May to July 1998 Teuton obtained full-time employment as a staff physician, though not in the OB/GYN field.[5]

In September 1996, Paul Revere had Teuton undergo an independent medical evaluation by Dr. Harold Morgan, an expert in psychiatry. Dr. Morgan diagnosed Teuton with moderately severe depression. Dr. Morgan said that Teuton was residually disabled under the policy because he could perform "some" of the important duties of an OB/GYN, such as an examination, but not other important functions, such as surgery (because of his drug-induced tremor). Dr. Morgan noted alternatives to Teuton's tremor-inducing antidepressant, but admitted that Teuton's depression will periodically prevent him from performing as an OB/GYN specialist.

Based on Dr. Morgan's diagnosis and Teuton's unemployed status, Paul Revere stopped paying Teuton in January 1997. Teuton filed his

_____

[4] Electrotherapy might improve Teuton's depression but may also cause severe memory loss.
[5] The record is unclear as to Teuton's employment, if any, from January through April 1998. Because the jury found Teuton totally disabled during time periods both before and after that uncertain timeframe, any employment Teuton may have had would not alter the jury's findings.

complaint alleging breach of contract and bad-faith failure to pay. The jury found that Teuton was due total disability benefits from February to April 1997, residual benefits from May through September 1997, and total disability benefits from October 1997 through August 1998. Paul Revere made no payments during the relevant time period. Paul Revere moved the court for a judgment as a matter of law or for a new trial. The court denied the motion on both grounds. This appeal followed.

II.

Paul Revere argues that the district court erroneously excluded the admission of certain evidence from trial. A district court's evidentiary rulings are reviewed for an abuse of discretion. See WLR Foods, Inc. v. Tyson Foods, Inc., 65 F.3d 1172, 1174 (4th Cir. 1995).

A.

The district court did not abuse its discretion by excluding, under Fed. R. Evid. 403, evidence of Teuton's 1993 alleged attack on Johnnie.[6] Rule 403 excludes evidence that, "although relevant . . . its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Fed. R. Evid. 403. The district court reasoned:

> I'm going to tell you, I can't think of anything more prejudicial than letting you tell the jury the man tried to kill his wife, and I can hardly dream up anything more detrimental to a person's position in court than to tell the jury that. And there's got to be some very good and relevant reasons to allow that kind of testimony to be the lens through which the jury views all the other evidence.

Paul Revere says the district court wrongfully ignored the potential probative value of the November 1993 arrest evidence, that is,

_____

[6] Teuton argues that Fed. R. Evid. 404(b) also bars the admission of the evidence. We need not resolve the applicability of Rule 404(b) because relevant evidence offered under Rule 404(b) is subject to Rule 403's exclusion, see Westfield Ins. Co. v. Harris, 134 F.3d 608, 614 (4th Cir. 1998), which is our basis for upholding the district court.

whether Teuton feigned depression to escape prosecution.[7] Paul Revere wanted to argue that Teuton's criminal conduct caused his loss of privileges at Byerly Hospital and prevented him from obtaining privileges elsewhere. Because Teuton could not perform as an OB/GYN specialist without privileges, Paul Revere continues, Teuton's November 1993 arrest is the real reason why he was unable to perform important OB/GYN duties. Paul Revere says that the Fourth Circuit admits prejudicial evidence in similar situations, citing Mullen v. Princess Anne Volunteer Fire Co., Inc., 853 F.2d 1130, 1134 (4th Cir. 1988); Westfield Ins. Co. v. Harris, 134 F.3d 608 (4th 1998).

We disagree with Paul Revere. The district court's balance of the probative value and unfair prejudice, as remarked in the record, is not an abuse of discretion:

> [a]ny discussion of [Teuton] being arrested is not important, it's irrelevant . . . . I don't want anything about his alleged intent to kill his wife to color everything that happens in this trial. . . . [W]hat we are interested in is why he was depressed or why he's qualified under the policy or not qualified. And if he's not been convicted of a criminal action, the fact that he was arrested or that somebody kept him in jail for 10 days to me is highly prejudicial to a fair assessment of the facts. . . . At some point [Paul Revere was] paying him. . . . Now, if [Paul Revere] had reached that decision and that he was qualified for payments under the policy, I don't need to hear before that a whole lot of history of what he did just to taint the jury. . . . I don't want any discussion of the arrest, because that's prejudicial, unfairly so, and it's not relevant.

The cases relied on by Paul Revere, moreover, involve evidence

---

[7] Although Paul Revere's brief mentions the district court's exclusion of Teuton's April 1994 arrest for violating a restraining order obtained by Johnnie, this exclusion was not raised in oral argument. We note, however, that this evidence would be properly excludeable for the same reasons as the November 1993 arrest. Teuton's criminal and civil cases pertaining to his alleged activity involving Johnnie, moreover, were either dropped or settled according to his counsel.

with clear probative value in light of the underlying cause of action. Paul Revere's proposed evidence, of course, offers a far more tenuous link to the underlying breach of contract claim.

For instance, in an employment-related racial discrimination case, where racial animus was an issue, it was error for the district court to exclude inflammatory racial slurs made by the defendants. See Mullen v. Princess Anne Volunteer Fire Co., Inc., 853 F.2d 1130, 1133 (4th Cir. 1988). Because the plaintiff in such a case "must show that racial animus was a motivating factor in the decision," the "emotional reaction claimed to be unfairly prejudicial is . . . closely tied to the inquiry." Id. at 133-35.[8]

In Westfield, the defendant-insurer wanted to admit evidence under Rule 404(b) that the insured had seven prior fire loss claims, suggesting an absence of mistake or accident. See Westfield Ins. Co. v. Harris, 134 F.3d 608 (4th Cir. 1998). We agreed that this evidence was relevant as to the policy's coverage for the loss, but held that the district court failed to adequately explain how the evidence was prejudicial under Rule 403. Id. at 614.

In the record before us, the district court adequately explained how evidence of Teuton's arrest is unfairly prejudicial under Rule 403. The arrest evidence, moreover, does not "aid[the jury's] search for truth;" that is, whether Teuton was entitled to benefits under the Paul Revere policy. Mullen, 853 F.2d at 1135. The arrest evidence, unlike the evidence in Mullen and Westfield, is irrelevant to the breach of contract action against Paul Revere.

From an evidentiary perspective, Paul Revere's theory that Teuton's involuntary commitment was an elaborate device to avoid prosecution is unsupportable. There is no evidence that his family doctor, Dr. Bell, initially applied for Teuton's commitment with a fraudulent

_____

[8] **Mullen** notes that because the district court could have instructed the jury to consider the statements only on the question of discriminatory intent, outright exclusion was improper. While a limiting instruction can blunt the potential prejudice of evidence, see U.S. v. Powers, 59 F.3d 1460 (4th Cir. 1995), Paul Revere's brief does not indicate that they asked for a limiting instruction. See Fed. R. Evid. 105 (the court shall, "upon request," instruct the jury as to the limited scope of evidence admissible for one purpose but not for another).

motive. There is no credible evidence that Dr. Nelson's diagnosis was in any way designed to help Teuton avoid prosecution. There is no evidence that the judge's re-commitment to Charter Rivers after Teuton's initial discharge was designed to skirt the criminal system. By dismissing Paul Revere's theory the probativeness of the arrests becomes incredibly low, if not non-existent, while the unfair prejudice remains high.**9**

B.

Paul Revere argues, secondly, that the district court erroneously excluded evidence within Teuton's November 1994 and February 1997 applications for hospital privileges at Palmetto Richland Memorial Hospital in South Carolina ("Palmetto"). Paul Revere maintains that statements within those files support the theory advanced when proffering the November 1993 arrest evidence: Teuton's criminal conduct caused Teuton's loss of hospital privileges and, having no such privileges, prevented Teuton from performing as an OB/GYN specialist. The depression Teuton claims, the theory continues, was feigned to avoid criminal prosecution. The proffered Palmetto materials, therefore, contradict Teuton's position at trial that his depression caused his inability to perform the important duties of an OB/GYN. After an in camera review, the district court admitted only portions of the documents.

In a November 1994 letter, Teuton writes that Byerly Hospital revoked his privileges because of his November 1993 domestic dispute and arrest involving Johnnie. The letter adds that Byerly did not question Teuton's clinical abilities. The only portion read to the jury, however, states "I have been treated successfully for depressions and I am ready to pursue my occupation." The February 1997 Palmetto application includes Teuton's response to general inquiries (licensing, education, et cetera), as well as his history of depression. The district court permitted Paul Revere to read to the jury portions where Teuton

_____

**9** Paul Revere says they also wanted to use Teuton's arrest to cross-examine Teuton's witnesses that offered psychiatric diagnosis. Even if Paul Revere had stressed this issue, the district court's decision to exclude the evidence under Fed. R. Evid. 403 is not, in this context as well, an abuse of discretion.

says that he does not "take any medications" nor does he "have any mental or physical condition which could interfere with [his] ability to provide care or call coverage for [his] patients."

We find no error in the district court's decision to exclude portions of the application materials. A South Carolina statute says that "all proceedings of and all data and information acquired by the committee (of a hospital executive staff) . . . are confidential." S.C. Code Ann. § 40-71-20 (incorporating S.C. Code Ann.§ 40-70-20). The South Carolina Supreme Court says that this prevents discovery of a physician's applications for staff privileges and documents submitted to an executive committee of hospital medical staff. See McGee v. Bruce Hospital System, 312 S.C. 58, 439 S.E.2d 257 (1993). The district court admitted the above portions, nevertheless, ruling that the South Carolina law was not intended to let a doctor assume conflicting positions in an application and in court. The portions admitted were sufficient to inform the jury of their evidentiary value to Paul Revere; that is, that Teuton was telling a hospital that he could perform as an OB/GYN specialist. It may be, indeed, that the South Carolina statute would not have permitted any of the application's contents into evidence. Moreover, the portion excluded from the November 1994 letter included Teuton's disclosure of the November 1993 arrest incident, evidence that we have already deemed properly excluded from trial under Fed. R. Evid. 403.**10**

III.

Paul Revere says the district court wrongfully denied its motion for judgment as a matter of law, or, alternatively, for a new trial because the jury's findings were inconsistent and because the evidence does not establish that Teuton was totally disabled under the policy. A motion for judgment as a matter of law may be granted if the evidence is so substantial or conclusive that any contrary verdict would necessarily be based upon speculation or conjecture. See Gairola v. Virginia Dep't. of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985).

---

**10** The district court also excluded other Palmetto-related documents proffered by Paul Revere. On appeal, Paul Revere only argues that the complete November 1994 and February 1997 applications should have been admitted and suggests no error regarding the other documents.

10

Because a district court's decision on a motion for judgment as a matter of law is reviewed de novo, see id. ; Princess Cruises, Inc. v. General Electric Co., 143 F.3d 828, 831 (4th Cir. 1998) (citations omitted), evidence is viewed in the light most favorable to the party against whom the motion is made. See Garraghty v. Jordon, 830 F.2d 1295, 1302 (4th Cir. 1987); Andrade v. Mayfair Management, Inc., 88 F.3d 258, 261 (4th Cir. 1996). Judgment at law is proper "when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." Singer v. Dungan, 45 F.3d 823, 826 (4th Cir. 1995) (citation omitted). The denial of a motion for a new trial is reviewed for abuse of discretion. See Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp. , 41 F.3d 182, 186 (4th Cir. 1994). We find no grounds to reverse the district court's decision.

Specifically, the jury determined Teuton totally disabled from February 1997 through April 1997. During this time Teuton said he was pursuing his writing career. Paul Revere argues that because Teuton's February 1997 application to Palmetto states that Teuton is able to work the jury's finding is erroneous. From May through September 1997 the jury found Teuton residually disabled. Paul Revere says this is inconsistent with evidence that Teuton was actually unemployed for two of those months and only worked part-time for the other three months. Paul Revere adds that this jury finding means, by deduction, that the jury determined that Teuton could do some important duties of an OB/GYN during this time frame. The jury also found Teuton totally disabled from October 1997 to July 1998. Paul Revere says this is inconsistent with evidence that proves Teuton worked part-time in urgent medical care from October through December 1997 and then as a full-time medical staffer from May to July 1998. Moreover, there was insufficient evidence to indicate how Teuton was able to perform at least one important function of an OB/GYN, as reflected in the jury's finding of "residually disabled" for May to September 1997, but then could not perform any important functions afterwards.

Viewing the evidence in favor of Teuton, as we must, we find no error in the district court's decision. Teuton's employment in non-OB/GYN jobs is irrelevant to his policy rights. Teuton provided ample medical expert testimony that he could not perform the important duties of an OB/GYN because of his depression. The jury's deter-

11

mination that Teuton was merely residually disabled from May to September 1997 is not unreasonable because Teuton was working part-time at the impotency clinic in May 1997. The jury was informed that Teuton told Paul Revere, during the Summer of 1997, that he was establishing a new occupation and "reentering" the medical field. It is not clear when Teuton stopped working at the impotency clinic, but because his next employment began in October 1997, the jury could infer that this position lasted until September 1997. The jury could, therefore, reasonably conclude that Teuton could do some of the important duties of an OB/GYN during that period.

AFFIRMED

12